**ORIGINAL**

Approved: _Paul Monteleoni_       DOC # __1__
PAUL M. MONTELEONI
Assistant United States Attorney

Before:   THE HONORABLE HENRY B. PITMAN
          United States Magistrate Judge
          Southern District of New York

15 MAG 0490

- - - - - - - - - - - - - - - - - x
                                  :
UNITED STATES OF AMERICA          :    **SEALED COMPLAINT**
                                  :
     - v. -                       :    Violations of
                                  :    18 U.S.C. §§ 1343, 1346,
ARKADIY MOLDAVSKIY,               :    1347 and 2
                                  :
               Defendant.         :    COUNTY OF OFFENSE:
                                  :    NEW YORK
- - - - - - - - - - - - - - - - - x

SOUTHERN DISTRICT OF NEW YORK, ss.:

        PAUL M. TAKLA, being duly sworn, deposes and says that he is a Special Agent with the Federal Bureau of Investigation ("FBI"), and charges as follows:

COUNT ONE
(Wire Fraud)

        1.  From at least on or about August 14, 2014 through on or about the date of the filing of this Complaint, in the Southern District of New York and elsewhere, ARKADIY MOLDAVSKIY, the defendant, together with others known and unknown, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and to deprive the New York City Human Resources Administration ("HRA") of MOLDAVSKIY's honest services, for the purpose of executing such scheme and artifice, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, to wit, MOLDAVSKIY solicited bribes from a patient through a cooperating witness (in order to secure the services of a home health attendant under the HRA's Home Care Services Program on favorable terms for the patient, and engaged in telephone



calls in order to plan the bribe scheme and set up meetings to plan the bribe scheme.

(Title 18, United States Code, Sections 1343, 1346 and 2.)

## COUNT TWO
(Health Care Fraud)

2. From at least on or about August 14, 2014 through on or about the date of the filing of this Complaint, in the Southern District of New York and elsewhere, ARKADIY MOLDAVSKIY, the defendant, executed and attempted to execute a scheme and artifice to defraud a health care benefit program, and to obtain, by means of false and fraudulent pretenses, representations, and promises money and property owned by and under the custody and control of a health care benefit program in connection with the delivery of and payment for health care benefits, items, and services, to wit, MOLDAVSKIY solicited bribes from patient through a cooperating witness in order to secure the services of a home health attendant under the HRA's Home Care Services Program on favorable terms for the patient.

(Title 18, United States Code, Sections 1346, 1347 and 2.)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

3. I am a Special Agent with the FBI and have been employed by the FBI since 2005. I have participated in the investigation of this matter along with personnel from the New York City Department of Investigation ("DOI"), and I am familiar with the information contained in this affidavit based on my own personal participation in the investigation, my review of documents, recordings, and conversations that I have had with other law enforcement agents and other individuals. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents, and the actions and statements of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

## Background

4. Based on my training and experience, my review of documents, and my conversations with others, I have learned the following:

    a. Various publicly-funded health insurance plans are available to low-income individuals and their children in New York State and elsewhere. These plans include, among others, Medicaid, a health insurance program for low-income adults and children, and other similar publicly-funded health insurance plans (collectively, "public health insurance"), which fall within what is commonly referred to as the Medicaid Program, a health care benefit program as defined in Title 18, United States Code, Section 24(b).

    b. While the Medicaid Program is largely federally-funded, it is administered by the states.

    c. The New York State Department of Health (the "NY DOH") administers the Medicaid Program in New York State. The United States Department of Health and Human Services ("HHS") provides more than $1 billion annually to the NY DOH to fund and/or reimburse the costs of the Medicaid Program.

    d. Local departments of social services within New York State process applications for health insurance plans falling within the Medicaid Program and monitor the provision of plans at the local level.

    e. In New York City, the pertinent department of social services with respect to the Medicaid Program is the Human Resources Administration ("HRA"), which is an agency of the City of New York. HRA processes applications for health insurance plans falling within the Medicaid Program in its office in New York, New York, and acts on behalf of NY DOH.

    f. One of the programs administered by HRA is the Home Care Services Program, which includes the Personal Care program. The Personal Care program provides home attendant and/or housekeeping services to Medicaid-eligible clients who are having difficulty with at least one or more activities of daily life, such as walking, cooking, cleaning, bathing and using the bathroom, and who are in stable medical condition.

    g. For Medicaid eligible clients seeking personal care services, Home Care Services Program staff assesses the personal

-3-

care needs and determines the appropriate level of care. Services in the home are provided through contracted home care agencies. The Personal Care program provides case management through its nine Community Alternative Systems Agency ("CASA") offices.

   h. To apply for Personal Care services, a doctor or medical professional needs to complete and sign an HRA Home Care Services Program Form M-11q (an "M-11q Form"). An M-11q Form, which is captioned "Medical Request for Home Care" requires the provision of information regarding the patient's medical conditions, prognosis, hospital information, and medical equipment or supplies possessed or needed by the patient. The form asks if the completing health care professional recommends the provision of service to assist with personal care and/or light housekeeping tasks based on the patient's medical condition.

   i. The M-11q Form is returned either to a central intake location or to a CASA office in one of the five boroughs for processing. For clients who have not already been determined eligible for Medicaid, the M-11q Form must be accompanied by a completed Medicaid application.

   j. The medical professional completing the M-11q Form on behalf of the patient must not recommend or request the number of hours of personal care services. Instead, the determination of whether to approve personal care services for an applicant, and if so how many hours of such services to approve, is made by the Home Care Services Program's Bureau of Medical and Professional Review after an evaluation of the patient by a nurse working for HRA.

The Scheme

   5. Based on my review of documents and recordings, my conversations with representatives of DOI and my investigation, I have learned that ARKADIY MOLDAVSKIY, the defendant, is employed as a caseworker for HRA. As a caseworker, MOLDAVSKIY is responsible for identifying and screening potentially eligible individuals for participation in HRA programs.

   6. As set forth below, our investigation has revealed that since on or about August 14, 2014, MOLDAVSKIY has abused his position. Specifically, MOLDAVSKIY has solicited cash payments from individuals potentially eligible for the Personal Care program in exchange for preferential treatment in the program. Specifically, he has solicited, through an intermediary, a payment of $1000 for MOLDAVSKIY and an additional payment of $500 for the

-4-

intermediary in exchange for MOLDAVSKIY causing the approval by HRA of more hours of personal care services than HRA would otherwise approve, and also in exchange for MOLDAVSKIY arranging for the patient to have a highly attentive and helpful case manager.

## The Investigation

7. In approximately the summer of 2014, a cooperating witness (the "CW")[1] received information from an individual ("Individual-1") suggesting that ARKADIY MOLDAVSKIY, the defendant, was interested in engaging in transactions related to HRA programs. Individual-1 provided the CW with MOLDAVSKIY's phone number.

8. On or about August 14, 2014, at my direction and under my supervision, the CW called ARKADIY MOLDAVSKIY, the defendant.[2] During the call, which was consensually recorded, the CW informed MOLDAVSKIY, in substance and in part, that the CW had been given MOLDAVSKIY's phone number by another individual "Individual-1" and arranged to meet.

9. On or about August 21, 2014, at my direction and under my supervision, the CW met ARKADIY MOLDAVSKIY in Brooklyn. During this meeting, which was consensually recorded, MOLDAVSKIY and the CW discussed transactions related to various HRA programs. Among other things, they discussed the following, in substance and in part:

AM: I need, how can I say it, elderly men and women that need home health aides, maybe they need to increase their hours.

CW: Ah, okay.

AM: Increase their hours.

CW: Is this also through HRA?

---

[1] The CW has pleaded guilty to six counts of mail fraud and bribery offenses in the United States District Court for the Southern District of New York, and is cooperating with the FBI and the Government in the hope of receiving a more lenient sentence. The CW has proven reliable and information provided by the CW has generally been corroborated.

[2] All conversations referenced herein were in Russian, a language I do not speak. I have reviewed draft English transcripts of certain of these conversations.

```
AM:  No, it's a different story.

CW:  Ah, it's a different thing [UI]

AM:  [OV] [UI] No, no, it's a different tale. That was before.[3]

CW:  Need senior citizens that-that--

AM:  [OV] That need an increase in hours.

CW:  Increase in hours.

AM:  Yes.

CW:  For example, if they have half a day, or like a whole day,
     you can increase their hours?

AM:  [OV] Yes, yes, yes. Yes.

CW:  What can we profit from this?

AM:  Oh, that's a good question. We can get, this isn't done
     for a 'thank you' either

CW:  Uh-huh.

AM:  Also, I want that.

CW:  [UI]

AM:  Well, the hours are increased for a person.

CW:  Uh-huh.

AM:  That's what it is, you understand? A thousand.

CW:  A thousand for each case?

AM:  Yes.
```

---

[3] Although MOLDAVSKIY answered "no" to the question "Is this also through HRA?", I believe based on the other conversations, as set forth below, that he was differentiating this proposed transaction involving home health aides from a different HRA program scheme MOLDAVSKIY and the CW were discussing earlier in this call, and that this proposed home health aide transaction involved HRA.

-6-

CW:   Uh-huh.

AM:   Naturally.

CW:   You can increase their hours.

AM:   Yes. Me? Yes.

CW:   What offices?  Do these need to be special offices?  Are there friendly . . . ?

AM:   No, I have a couple or three offices that I--

CW:   [OV] Are there a lot of acquaintances that [UI]

AM:   Well, there's no need, I need for you and me to profit.

CW:   Ah, okay, I got it.

AM:   And that's it. I need for you and me to make money.

    10. On or about September 15, 2014, at my direction and under my supervision, the CW met with ARKADIY MOLDAVSKIY, the defendant, in Brooklyn.  During this meeting, which was consensually recorded, MOLDAVSKIY said, in substance and in part, that if a person who had a home attendant and wanted more hours, MOLDAVSKIY would "try to make more," referring to hours.  He also stated:

AM:   No, no, no. I'm explaining. Find a person for me.

CW:   Uh-huh.

AM:   Then we'll take the next step. I don't want you to bother with it right now.  There are several good *steps* to it. For doing that we charge. . . You understand?

CW:   Yes.  How much?  One hundred, 200, 300, 500?

AM:   Well, if it's a good increase, it's the same figure I showed you in the beginning.

CW:   A grand.

AM:   Well, yeah.

>   CW:  Okay, got you, [OV] so this job is estimated at 1,000 dollars.
>
>   AM:  [OV] Yeah, yeah.

In this meeting, the CW also asked "is the money paid upfront?" and MOLDAVSKIY replied "upfront." In this meeting, MOLDAVSKIY also described providing home attendant services to patients who do not currently have home attendants:

>   AM:  And . . . if you find a person who needs a home attendant. He hasn't had one yet.
>
>   CW:  You mean an old lady?
>
>   AM:  Yes.
>
>   CW:  Who needs a home attendant.
>
>   AM:  Yes. Uh-huh. And again she gets a wonderful case manager, excellent attitude, all the issues resolved.
>
>   CW:  You mean all the offices are taken care of or you have your own office?
>
>   AM:  No I have certain people whom I can talk to like I talk to you.
>
>   CW:  Aha, that's it then. You just send them to your office and they *handle* them.
>
>   AM:  [OV] Yeah, yeah, that's true.

   11.   On or about October 9, 2014, at my direction and under my supervision, the CW met with ARKADIY MOLDAVSKIY, the defendant, in Brooklyn. During this meeting, which was consensually recorded, MOLDAVSKIY, among other things, described the procedure for applying for a home attendant:

>   AM:  Right? So, he needs a *home attendant*. It's not like, "Here I am, I need a *home attendant*."
>
>   CW:  Does he have to be *approved* by somebody?
>
>   AM:  By the doctor.

CW:  The doctor.

AM:  There's this form, it's called M11Q.

CW:  M11Q form...

AM:  Yeah, everybody knows that form.

12.  On or about October 21, 2014, at my direction and under my supervision, the CW engaged in several consensually recorded telephone calls with ARKADIY MOLDAVSKIY, the defendant.  During these calls, in substance and in part, the CW asked MOLDAVSKIY for the name of the form used for a home attendant, and MOLDAVSKIY stated it was called "M-11q" and offered to print out a copy of the form for the CW.

13.  On or about October 22, 2014, at my direction and under my supervision, the CW met with ARKADIY MOLDAVSKIY, the defendant, in Brooklyn.  At this meeting, which was consensually recorded, MOLDAVSKIY provided the CW with a blank copy of an M-11q Form.  Later that day, under my supervision and at my direction, the CW called MOLDAVSKIY and asked questions about how the M-11q Form should be filled out.  In this call, which was consensually recorded, MOLDAVSKIY provided instructions about how the form should be filled out, including that the doctor must indicate that a home attendant was "strongly recommended."

14.  On or about November 3, 2014, at my direction and under my supervision, the CW, who was in Elizabeth, New Jersey, called ARKADIY MOLDAVSKIY, the defendant.  During this telephone call, which was consensually recorded, following was discussed, in substance and in part.

CW:  I see. The question is what, what am I getting out of this?

AM:  Um so listen to me, this is again a private conversation.

CW:  I understand yes.

AM:  Okay?

CW:  Okay alright I understand. Fine.

. . .

AM:  Come to me and we are going to decide this matter quickly.

During this call, the CW made plans to meet in person.

       15. On or about November 18, 2014, at my direction and under my supervision, the CW met with ARKADIY MOLDAVSKIY, the defendant, in Brooklyn. At this meeting, which was consensually recorded, the CW said he was ready with the home attendant case and asked "how it's going to be for us." In this meeting, the following was discussed, in substance and in part:

    AM:   So the idea is this. I told you, I want . . .

    CW:   A thousand.

    AM:   Yes.

    CW:   Okay, what am I in this? Where am I in this circumstance?

    AM:   If you, if you can, then you have to load more.

    CW:   How much do I load from her?

    AM:   $1,500.

    CW:   $1,500, then my . . . So who is giving me this $500?

    AM:   She is, she is.

    CW:   [UI] or are you giving it to me?

    AM:   She is.

. . .

    CW:   Okay, and you?

    AM;   She gives you $1,500.

    CW:   She gives me $1,500 so I take $500 for myself?

    AM:   Yes.

    CW:   And a thousand goes to you. At what point the thousand . . . when it's all done?

    AM:   No, only, no, no, no, no, listen to me.

CW:   I want to know.

. . .

AM:   In short, she gives you money.  Okay?

CW:   Okay, so she gives me $1,500.

AM:   Yes.

CW:   $500 I...

AM:   Show [UI]...

CW:   I take $500 for myself-

AM:   Yes.

CW:   -and bring $1,000 to you with the paperwork?

AM:   You don't bring me anything.  For now I don't want anything.  I trust you.  So you . . . me . . . So, she gives you the money.  She asks you a question, "[CW], is everything going to be ready?"  You say, "If everything will be ready then I keep this money.  If something doesn't go through, you get this money back.  That's clear, right?

CW:   It's one such option.

AM:   In other words, we don't . . . the person.  Now the next thing, so, what is my function going to be?  So I speak to the caseworker.

During this call, MOLDAVSKIY also said the caseworker would dispatch a nurse to meet the patient, and the nurse would determine the number of hours the patient would receive, so the patient had to be "prepared thoroughly."  MOLDAVSKIY said that MOLDAVSKIY and the CW would speak to the patient, and MOLDAVSKIY said "I will tell her what is necessary.  Otherwise there will be no success."  MOLDAVSKIY explained, "Because the nurse, she is not our person.  Let's say it like that.  Do you understand?"

    16.  On or about November 26, 2014, at my direction and under my supervision, the CW called ARKADIY MOLDAVSKIY, the defendant.  In this call, which was consensually recorded, the following was discussed, in substance and in part:

CW: Ah, and the main thing, right, the money?

AM: Well, of co-- well, listen, we don't say it over the phone, like . . . It's . . . yes, when things start moving.

CW: [OV] Yes. I got it. I have this question.

AM: Uh-huh.

CW: What. . . He's asking what's the deal. What is he paying for? It's just. . .

AM: Listen, can we discuss it over the phone? Well, I can tell you the following things. He . . . I'm explaining what for. Well, first of all, uh—for the help with those hours, that's number one. Secondly, he gets a manager who is absolutely out of this world for the whole time. You understand? Right—

CW: Yes, yes, yes.

AM: [OV] It's—

CW: [OV] I just want to explain to him what it's for.

AM: Yes, yes, yes. There's gonna be a case manager who will always be in the know.

CW: [OV] Who will control, right, that everything goes smoothly.

AM: Right, so that everything goes smoothly. And of course we need. . . We'll try to increase his hours.

17. On or about February 10, 2015, at my direction and under my supervision, the CW called ARKADIY MOLDAVSKIY, the defendant, from Manhattan. During the call, which was consensually recorded, the CW advised MOLDAVSKIY that he was in Manhattan and arranged a time and place to meet with MOLDAVSKIY for the purpose of the CW providing MOLDAVSKIY with an M-11q Form.

18. Later on February 10, 2015, at my direction and under my supervision, the CW met ARKADIY MOLDAVSKIY, the defendant, in Brooklyn. At that meeting, which was consensually recorded, the CW

provided MOLDAVSKIY with an M-11q Form filled out purportedly on behalf of a patient needing home care ("Patient-1"). MOLDAVSKIY advised the CW that several additional pieces of information needed to be included on the form. The CW asked MOLDAVSKIY when the CW should provide MOLDAVSKIY the money, and MOLDAVSKIY said that the CW should provide the money along with the revised M11-q Form.

19. On February 12, 2015, at my direction and under my supervision, the CW met ARKADIY MOLDAVSKIY, the defendant, in Brooklyn. At that meeting, which was consensually recorded, the CW provided MOLDAVSKIY with a revised M-11q Form filled out purportedly on behalf of Patient-1. At that meeting, the CW also provided MOLDAVSKIY with $1000 in cash, which MOLDAVSKIY accepted.

WHEREFORE, deponent respectfully requests that a warrant be issued for the arrest of ARKADIY MOLDAVSKIY, the defendant, and that he be imprisoned, or bailed, as the case may be.

PAUL M. TAKLA
Special Agent
FBI

Sworn to before me this
18th day of February, 2015

THE HONORABLE HENRY B. PITMAN
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK